# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
## FOURTH DIVISION

THOMAS LAUER,          \*

                        \*

    **Plaintiff,**        \*          **CIVIL CASE # _____**

                        \*

**v.**                        \*

                        \*

**PFIZER, INC., PHARMACIA**    \*

**CORPORATION, G.D. SEARLE LLC,**  \*

**(FKA G.D. SEARLE & CO.), and**    \*

**MONSANTO COMPANY,**       \*

                        \*

    **Defendants.**       \*

## COMPLAINT

COMES NOW, Thomas Lauer ("Plaintiff"), complaining of Pfizer, Inc., Pharmacia Corporation, G.D. Searle LLC (fka G.D. Searle & Co.), and Monsanto Company ("Defendants"), and for his cause of action against the Defendant states as follows:

### Statement of the Parties

1.    This is a Civil Action brought on behalf of Plaintiff, Thomas Lauer.  Plaintiff is a resident of Montgomery County, Ohio.  Pursuant to Minn. Stat. section 303.02(6) (1990), a Plaintiff who is a non-resident of Minnesota is able to bring action in this Court against foreign corporation Defendants. This Court has jurisdiction over this case under section 303.02(6), because Defendants conducted business in the State of Minnesota through pharmaceutical sales representatives conducting business in the State of Minnesota on behalf of Defendants, thus there exists a sufficient nexus between the Defendants' forum contacts and the Plaintiff's cause of action to justify assertion of jurisdiction in Minnesota.

2.    Defendant PFIZER, INC. ("PFIZER") is a Delaware corporation with its principal place of business in New York, New York.  On July 16, 2002 PFIZER announced its proposed

acquisition of PHARMACIA CORPORATION ('PHARMACIA"). On April 16, 2003, PFIZER completed its $60 billion acquisition of PHARMACIA. As a wholly-owned subsidiary of PFIZER, PHARMACIA acted in all aspects as PFIZER's agent and alter ego. At all relevant times, PFIZER and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name BEXTRA in Minnesota and throughout the United States. Defendant PFIZER is licensed and registered to do business in the State of Minnesota and may be served through its registered agent at Pfizer, Inc., 405 2nd Avenue South, Minneapolis, Minnesota 55401.

3.      Defendant G.D. SEARLE LLC, (FKA G.D. SEARLE & CO.) ("SEARLE") is a Delaware corporation with its principal place of business in Illinois. In April 2000 SEARLE was acquired by PHARMACIA, and became a wholly-owned subsidiary of PHARMACIA. At the time of PFIZER's acquisition of PHARMACIA, SEARLE was a wholly-owned subsidiary of PHARMACIA, acting as its agent and alter ego in all matters alleged in this Complaint, and is now a wholly-owned subsidiary of PFIZER. At all relevant times, SEARLE has been engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name BEXTRA in Minnesota and throughout the United States. G.D. Searle LLC's principal place of business is in Illinois and may be served through its registered agent at C T Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

4.      Defendant PHARMACIA is a Delaware corporation with its principal place of business in New Jersey. PHARMACIA was created in April 2000 through the merger of Pharmacia & Upjohn with Monsanto Company and its G.D. SEARLE unit. PHARMACIA is

now a wholly-owned subsidiary of PFIZER. At all relevant times, PHARMACIA, and its predecessors in interest have been engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name BEXTRA in Minnesota and throughout the United States. G.D. Searle LLC's principal place of business is in Illinois and may be served at its principal place of business at 100 U. S. Highway 206 North, Peapack, New Jersey 07977.

5.    Defendant MONSANTO COMPANY ("MONSANTO") was the parent corporation of SEARLE and is a Delaware corporation. At all times relevant hereto, MONSANTO, through its subsidiary companies, was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product BEXTRA in Minnesota and throughout the United States. Defendant MONSANTO is licensed and registered to do business in the State of Minnesota and may be served through its registered agent at Monsanto Company, 380 Jackson Street #418, St. Paul, Minnesota 55101.

6.    Valdecoxib was developed in 1998 by SEARLE and marketed jointly by SEARLE and PFIZER under the brand name BEXTRA. SEARLE was acquired by PHARMACIA, which was then acquired by PFIZER, in part so that PFIZER could take full control of BEXTRA.

7.    At all times relevant to this action, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the risks, dangers, defects, and disadvantages of BEXTRA, and advertised, promoted, marketed, sold and distributed BEXTRA as a safe prescription medication when, in fact, Defendants had reason to know, and did know, that BEXTRA was not safe for its intended purposes, for the patients for whom it was prescribed,

and for whom it was sold; and that BEXTRA caused serious medical problems, and in certain patients, catastrophic injuries and deaths.

8.      In engaging in the conduct alleged herein, each Defendant acted as the agent for each of the other Defendants, or those Defendant's predecessors in interest.

9.      Personal jurisdiction and subject matter jurisdiction are appropriate in this court as to all Defendants, as all Defendants have done business in Hennepin County, Minnesota, either directly or by agent, and have thus availed themselves of this jurisdiction.

10.     The Defendants have been and/or are currently engaged in business, directly or by authorized agent, in Hennepin County, Minnesota. Venue and jurisdiction are therefore proper. The claims of the Plaintiff herein satisfy the jurisdictional amount of this Court.

## Factual Background

### A.    <u>Facts Regarding Plaintiff</u>

11.     Plaintiff was prescribed and began taking BEXTRA for the treatment of pain.

12.     As a direct and proximate result of using BEXTRA, Plaintiff suffered a Heart Attack on March 1, 2004.

13.     Plaintiff and Plaintiff's healthcare providers were at the time of Plaintiff's injuries unaware—and could not have reasonably known or have learned through reasonable diligence—that such injury directly resulted from Plaintiff's ingestion of BEXTRA and Defendants' negligent and otherwise culpable acts, omissions, and misrepresentations.

14.     Plaintiff used BEXTRA in a proper and reasonably foreseeable manner and used it in a condition that was substantially the same as the condition in which it was manufactured and sold.

15.     Plaintiff would not have purchased and used BEXTRA had Defendants properly disclosed the risks associated with the drug, and through diligent effort was not able to discover the risk from BEXTRA prior to use of the drug.

A.     **Facts Regarding Bextra and Bextra's Market Launch**

16.     BEXTRA is one of a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

17.     NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

18.     In addition to decreasing inflammation, the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

19.     Prostaglandin I2 is the predominant cyclooxygenase product in endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a potent platelet aggregator and vasoconstrictor, which is synthesized by platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors support it.

20.     Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

21.     Defendants and other pharmaceutical companies set out to remedy these ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors that

would block only COX-2 production, thus (supposedly) allowing the proper maintenance of gastric tissue while still reducing inflammation.

22.    In making this decision, Defendants and their predecessors in interest either intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke, unstable angina. The vasoconstriction and fluid retention cause the hypertension.

23.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs, in early 1999 and initiated a massive marketing campaign to convince doctors and consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs.  In May 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

24.    Seeking increased market share in this extremely lucrative market, Defendants, and their predecessors in interest, also sought approval of a "second generation" selective COX-2 inhibitor and filed for FDA approval of BEXTRA on January 16, 2001 for the (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

25.    The FDA granted approval of the new drug on November 16, 2001, for two particular uses:  (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms of osteoarthritis and rheumatoid arthritis.

26.    The FDA did not grant approval to market and promote BEXTRA for the management or prevention of acute pain.

27.    The FDA did not grant approval to promote BEXTRA as more effective than other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or gastric bleeding.

28.    Even without a label that allowed Defendants to legitimately claim superior safety, when Defendants, and their predecessors-in-interest, began marketing BEXTRA in early 2002, Defendants and their representatives and agents misrepresented the safety profile of

BEXTRA to consumers, including Plaintiff, the medical community, healthcare providers, and third party payers. Defendants proceeded to promote, market, sell, and distribute BEXTRA as a much safer and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

**B.     Facts Regarding Bextra's Safety and Defendants' Knowledge Thereof.**

29.     The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants long before the FDA granted market approval in November 2, 2001. By 1997, and prior to the submission of the New Drug Application (the "NDA") for BEXTRA, Defendants was aware that, by inhibiting COX-2, BEXTRA altered the homeostatic balance between prostacylin synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954. Although all COX-2 inhibitors have this mechanism of action, BEXTRA was the most selective COX-2 inhibitor proposed for approval. Accordingly, it had the greatest potential to cause adverse cardiovascular and cerebrovascular events.

30.     As Pharmacologist, Dr. Garrett Fitzgerald, of the University of Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as BEXTRA, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

31.     Nevertheless, on January 16, 2001, Defendants submitted an NDA to the FDA for BEXTRA, omitting information about the extent of the risks associated with BEXTRA. Without a complete picture of the potential hazards associated with the drug, the FDA approved BEXTRA on or about November 16, 2001.

32.     Based on the studies performed on Celebrex, Vioxx, BEXTRA, and other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when BEXTRA was being developed and tested that selective

COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors. Studies show that selective COX-2 inhibitors, including BEXTRA, decrease blood levels of a prostacyclin. When those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and stroke.

33. On December 9, 2004, the FDA issued new information on side effects associated with the use of BEXTRA and required the addition of certain warnings to, and the strengthening of other warnings on, the BEXTRA label. The enhanced warnings followed in the wake of the results of additional cardiovascular studies performed by Defendants, as well as numerous complaints to the FDA regarding severe skin reactions.

34. Yet well prior to this warning, Defendants had knowledge of the coronary and cardiovascular safety risks of BEXTRA from several studies. *See e.g.*, Otto, E.O., *Efficacy and Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing Coronary Artery Bypass Surgery*, *The Journal of Thoracic and Cardiovascular Surgery*, June 2003 at 1481.

35. Even Defendants' own (and Pfizer funded) post- drug approval meta-analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data showing an increased cardiovascular risk in patients treated with BEXTRA after undergoing coronary artery bypass graft surgery. Observed events included heart attack, stroke, and blood clots in the legs and lungs. The results were particularly relevant and striking as each of the study participants who were a post-bypass surgery patient was taking anti-clotting agents at the time their exposure to BEXTRA was being tracked.

36. In mid-January 2005, a peer-reviewed paper from the University of Pennsylvania found that in patients having heart bypass surgery, those who took BEXTRA in the intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a heart attack or stroke.

37.    From February 16-18, 2005, the FDA's Drug Safety and Risk Management Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine the safety of COX-2 inhibitors.  There, FDA Office of Drug Safety Officer David Graham testified that selective COX-2 inhibitors increase the risk for adverse cardiovascular events at about the same rate as cigarette smoking, hypertension, and diabetes.

38.    Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of BEXTRA, Defendants failed to take any action to protect the health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

39.    On April 7, 2005, the FDA finally insisted that Defendants "voluntarily withdraw" BEXTRA from the U.S. market, stating:

> ". . . the Agency has concluded that the overall risk versus benefit profile of BEXTRA is unfavorable.  This conclusion is based on the potential increased risk for serious cardiovascular (CV) adverse events, which appears to be a class effect of non-steroidal anti-inflammatory drugs (NSAIDs) (excluding aspirin), an increased risk of serious skin reactions (e.g. toxic epidermal necrolysis, Stevens-Johnson syndrome, erythema multiforme) compared to other NSAIDs, and the fact that BEXTRA has not been shown to offer any unique advantage over the other available NSAIDs."

40.    FDA Alert for Healthcare Professionals, April 7, 2005.  Continuing, the FDA noted:

> "BEXTRA has been demonstrated to be associated with an increased risk of serious adverse CV events in two short-term trials in patients immediately post-operative from coronary artery bypass graft (CABG) surgery . . . .  FDA has concluded that it is reasonable to extrapolate the adverse CV risk information for BEXTRA from the short-term CABG trials to chronic use given the fact that other COX-2 selective NSAIDs have been shown in long-term controlled clinical trials to be associated with an increased risk of serious adverse CV events (e.g., death, MI, stroke), and the well described risk of serious, and often life-threatening gastrointestinal bleeding . . . .  To date, there have been no studies that demonstrate an advantage of BEXTRA over other

NSAIDs that might offset the concern about the[] serous skin risks, such as studies that show a GI safety benefit, better efficacy compared to other products, or efficacy in a setting of patients who are refractory to treatment with other products."

41.    The scientific data available during and after BEXTRA's approval process made clear to Defendants that their formulation of BEXTRA would cause a higher risk of blood clots, stroke and/or myocardial infarctions among BEXTRA consumers, alerting them to the need to do additional and adequate safety studies.

42.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further cardiovascular events."

43.    Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2 inhibitors.

44.    Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of BEXTRA did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take BEXTRA. Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for BEXTRA (noting that: "**Platelets**: In four clinical studies with young and elderly (>/=65 years) subjects, single and multiple doses up to 7 day mg BID had no effect on platelet aggregation").

45.    Had Defendants done adequate testing prior to approval and "market launch," rather than the extremely short duration studies done on the small size patient base that was actually done) Pharmacia and Searle's scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of BEXTRA consumers. Adequate testing would have shown that BEXTRA possessed serious side effects for individuals such as Plaintiff. Defendants should have taken appropriate measures to

ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

46.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but this information was intentionally suppressed by Defendants in order for them to gain significant profits from continued BEXTRA sales.

47.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

48.    At the time Defendants manufactured, advertised, and distributed BEXTRA to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers such as Plaintiff would not purchase BEXTRA, but instead would purchase other cheaper and safer NSAIDs.

C.    **Facts Regarding Defendants' Marketing and Sale of Bextra**

49.    Plaintiff and at all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive BEXTRA as a safer and better drug than its other NSAIDs and, therefore, purchase BEXTRA.

50.    Defendants widely and successfully marketed BEXTRA throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of BEXTRA in order to induce a widespread use and consumption. BEXTRA was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff prescribing physicians.

51.    Despite knowledge of the dangers presented by BEXTRA, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for

- 11 -

the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product, BEXTRA, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product, BEXTRA. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product, BEXTRA, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

52.    In an elaborate and sophisticated manner, Defendants aggressively marketed BEXTRA directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payers, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include BEXTRA on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payers were compelled to add BEXTRA to their formularies. Defendants' marketing campaign specifically targeted third party payers, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of BEXTRA.

53.    Defendants represented that BEXTRA was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance, NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use. Defendants promoted BEXTRA as a safe and effective alternative that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

54.    BEXTRA possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable

angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, BEXTRA was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Defendants chose not to warn about these risks and dangers.

55. Defendants knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved BEXTRA for sale on November 16, 2001, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of BEXTRA. Defendants' omission, suppression, and concealment of this important information enabled BEXTRA to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

56. Consequently, BEXTRA captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2002 alone (after a drug launch in March of 2002), sales of BEXTRA exceeded $1.5 billion, despite the significantly higher cost of BEXTRA as compared to other pain relievers in the same family of drugs.

57. It was not until April 7, 2005, that Defendants finally acknowledged BEXTRA's deleterious side effects and announced that they were withdrawing the drug from the worldwide market based on what it misleadingly termed "new" and "unexpected" evidence linking BEXTRA to an increased risk of heart attacks and strokes.

58. Had Defendants done adequate testing prior to approval and "market launch," Pharmacia's scientific data would have revealed significant increases in stroke and myocardial infarction amongst the intended population of BEXTRA consumers. Adequate testing would have shown that BEXTRA possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

59.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but this information was intentionally suppressed by Defendants in order for them to gain significant profits from continued BEXTRA sales.

60.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

61.    At the time Defendants manufactured, advertising, and distributed BEXTRA to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers such as plaintiff would not purchase BEXTRA, but instead would purchase other cheaper and safer NSAID drugs.

62.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers, including plaintiff, and their doctors would perceive BEXTRA as a better drug than its competitors and, therefore, purchase BEXTRA.

63.    Defendants widely and successfully marketed BEXTRA throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of BEXTRA in order to induce a widespread use and consumption.  BEXTRA was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff' prescribing physicians.

64.    Prior to manufacturing, sale and distribution of BEXTRA, Defendants, through their officers, director and managing agents, had notice and knowledge from several sources, that BEXTRA presented substantial and unreasonable risks of harm to the consumer.  As such, BEXTRA consumers, including Plaintiff, were unreasonably subject to risk of injury or death from the consumption of Defendants' product, BEXTRA.

65.    Despite such knowledge, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product, BEXTRA, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product, BEXTRA. Defendants and their officers, agents and managers intentionally proceeded with the inadequate testing, and then the manufacturing, sale and marketing of Defendants' product, BEXTRA, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Negligence

66.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

67.    Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling BEXTRA. This duty included the duty not to introduce a pharmaceutical drug, such as BEXTRA, into the stream of commerce that caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

68.    At all relevant times to this action, Defendants owed a duty to properly warn Plaintiff and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug BEXTRA.

69.    Defendants breached their duties by failing to exercise ordinary care in the preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing, promotion, advertising and selling of BEXTRA, including:

(a)    failing to use due care in the preparation and development of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(b)    failing to use due care in the design of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(c)    failing to conduct adequate pre-clinical testing and research to determine the safety of BEXTRA;

(d)    failing to conduct adequate post-marketing surveillance and exposure studies to determine the safety of BEXTRA;

(e)    failing to completely, accurately and in a timely fashion, disclose the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff, consumers, the medical community, and the FDA;

(f)    failing to accompany BEXTRA with proper warnings regarding all possible adverse side effects associated with the use of BEXTRA;

(g)    failing to use due care in the manufacture, inspection, and labeling of BEXTRA to prevent the aforementioned risk of injuries to individuals who used BEXTRA;

(h)    failing to use due care in the promotion of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(i)    failing to use due care in the sale and marketing of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(j)    failing to use due care in the selling of BEXTRA to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

(k)    failing to provide adequate and accurate training and information to the sales representatives who sold BEXTRA;

(l)    failing to provide adequate and accurate training and information to healthcare providers for the appropriate use of BEXTRA; and

(m)    being otherwise reckless, careless and/or negligent.

70.    Despite the fact that Defendants knew or should have known that BEXTRA caused unreasonable and dangerous side effects which many users would be unable to remedy by

any means, Defendants continued to promote and market BEXTRA to consumers, including Plaintiff, when safer and more effective methods of pain relief were available.

71.    Defendants were, or should have been had they exercised reasonable care, in possession of evidence demonstrating that BEXTRA caused serious side effects. Nevertheless, they continued to market their products by providing false and misleading information with regard to the safety and efficacy of BEXTRA.

72.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described above.

73.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff, sustained a Heart attack; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

74.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Strict Liability

75.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleged as follows:

76.    At all times relevant to this action, Defendants were suppliers of BEXTRA, placing the drug into the stream of commerce.  BEXTRA was expected to and did reach Plaintiff without substantial change in the condition in which it was manufactured and sold.

77.    BEXTRA was unsafe for normal or reasonably anticipated use.

78.    BEXTRA was defective in design or formulation because when it left the hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous than an ordinary consumer would expect.  BEXTRA was also defective and unreasonably dangerous in that the foreseeable risk of injuries from BEXTRA exceeded the benefits associated with the design and/or formulation of the product.

79.    BEXTRA is unreasonably dangerous: (a) in construction or composition; (b) in design; (c) because an adequate warning about the product was not provided; (d) because it does not conform to an express warranty of the manufacturer about the product.

80.    BEXTRA as manufactured and supplied by Defendants was also defective due to inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate reporting regarding the results of the clinical trials, testing and study.  Defendants failed to perform adequate testing before exposing Plaintiff to the medication, testing which would have shown that BEXTRA had the potential to cause serious side effects including the injuries suffered like the Plaintiff.

81.    BEXTRA as manufactured and supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of injuries from BEXTRA, they failed to provide adequate warnings to the medical community and the consumers, to whom they were directly marketing and

advertising BEXTRA; and, further, it continued to affirmatively promote BEXTRA as safe and effective.

82.    BEXTRA was manufactured, distributed, tested, sold, marketed, advertised and promoted defectively by Defendants, and as a direct and proximate cause of Defendants' defective design of BEXTRA, Plaintiff used BEXTRA rather than other safer and cheaper NSAIDs. As a result, Plaintiff suffered the personal injuries described herein.

83.    Information given by Defendants to the medical community and to the consumers concerning the safety and efficacy of BEXTRA, especially the information contained in the advertising and promotional materials, did not accurately reflect the potential side effects of BEXTRA.

84.    Had adequate warnings and instructions been provided, Plaintiff would not have taken BEXTRA, and would not have been at risk of the harmful side effects described herein.

85.    Defendants acted with conscious and deliberate disregard of the foreseeable harm caused by BEXTRA.

86.    Plaintiff could not, through the exercise of reasonable care, have discovered BEXTRA's defects or perceived the dangers posed by the drug.

87.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff sustained a Heart attack; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

88.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers,

including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

89.     WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### Breach of Express Warranty

90.     Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

91.     Defendants expressly represented to Plaintiff and other consumers and the medical community that BEXTRA was safe and fit for its intended purposes, that it was of merchantable quality, that it did not produce any dangerous side effects, particularly any unwarned-of side effects, and that it was adequately tested.

92.     These warranties came in the form of:

(a)     Defendants' public written and verbal assurances of the safety and efficacy of BEXTRA;

(b)     Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for BEXTRA, which failed to warn of the risk of injuries inherent to the ingestion of BEXTRA, especially to the long-term ingestion of BEXTRA;

(c)     Verbal and written assurances made by Defendants regarding BEXTRA and downplaying the risk of injuries associated with the drug;

(d)     False and misleading written information, supplied by Defendants, and published in the Physician's Desk Reference on an annual basis, upon which physicians relied in prescribing BEXTRA during the period of Plaintiff's ingestion of BEXTRA, and;

(e)     advertisements.

93.     The documents referred to above were created by and at the direction of Defendants.

94.     Defendants knew or had reason to know that BEXTRA did not conform to these express representations in that BEXTRA is neither as safe nor as effective as represented, and that BEXTRA produces serious adverse side effects.

95.     BEXTRA did not and does not conform to Defendants' express representations because it is not safe, has numerous and serious side effects, including unwarned-of side effects, and causes severe and permanent injuries.

96.     Plaintiff, other consumers, and the medical community relied upon Defendants' express warranties.

97.     As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff sustained a Heart attack; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

98.     Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

99.     WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### Breach of Implied Warranty

100.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

101.    Defendants manufactured, distributed, advertised, promoted, and sold BEXTRA.

102.    At all relevant times, Defendants knew of the use for which BEXTRA was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

103.    BEXTRA was not of merchantable quality and was not fit for its intended use, because it causes increased risk of serious cardiovascular and cerebrovascular adverse events, including heart attacks, strokes and other serious and harmful adverse health effects, such as death.

104.    Defendants breached the implied warranty that BEXTRA was of merchantable quality and fit for such use.

105.    Defendants were aware that consumers, including Plaintiff, would use BEXTRA for treatment of pain and inflammation and for other purposes.

106.    Plaintiff and the medical community reasonably relied upon Defendants' judgment and expertise to only sell them or allow them to prescribe BEXTRA only if it was indeed of merchantable quality and safe and fit for its intended use.  Consumers, including Plaintiff, and the medical community, reasonably relied upon Defendants' implied warranty for BEXTRA.

107.    BEXTRA reached consumers, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendants.

108.    Defendants breached their implied warranty to consumers, including Plaintiff; BEXTRA was not of merchantable quality or safe and fit for its intended use.

109.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff sustained a Heart attack; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff will continue to incur such losses in the future.

110.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

111.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## FIFTH CLAIM FOR RELIEF
### Fraudulent Misrepresentation & Concealment

112.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

113.    Defendants' superior knowledge and expertise, their relationship of trust and confidence with doctors and the public, their specific knowledge regarding the risks and dangers

of BEXTRA, and their intentional dissemination of promotional and marketing information about BEXTRA for the purpose of maximizing its sales, each gave rise to the affirmative duty to meaningfully disclose and provide all material information about BEXTRA's risks and harms to doctors and consumers.

114.    Defendants made fraudulent affirmative misrepresentations with respect to BEXTRA in the following particulars:

(a)    Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that BEXTRA had been tested and found to be safe and effective for the treatment of pain and inflammation; and

(b)    Defendants represented that BEXTRA was safer than other alternative medications.

115.    Defendants made affirmative misrepresentations; and fraudulently, intentionally and/or recklessly concealed material adverse information regarding the safety and effectiveness of BEXTRA.

116.    Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or had reason to know that BEXTRA had defects and was unreasonably dangerous and was not what Defendants had represented to the medical community, the FDA and the consuming public, including Plaintiff.

117.    Defendants omitted, suppressed and/or concealed material facts concerning the dangers and risk of injuries associated with the use of BEXTRA including, but not limited to, the cardiovascular, cerebrovascular, and other serious health risks.    Furthermore, Defendants' purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of BEXTRA in order to increase its sales.

118.    The representations and concealment were undertaken by Defendants with an intent that doctors and patients, including Plaintiff, rely upon them.

119.    Defendants' representations and concealments were undertaken with the intent of defrauding and deceiving Plaintiff, other consumers, and the medical community to induce and encourage the sale of BEXTRA.

120.    Defendants' fraudulent representations evinced their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

121.    Plaintiff's physicians and Plaintiff relied on and were induced by Defendants' misrepresentations, omissions, and/or active concealment of the dangers of BEXTRA in selecting BEXTRA treatment.

122.    Plaintiff and the treating medical community did not know that the representations were false and were justified in relying upon Defendants' representations.

123.    Had Plaintiff been aware of the increased risk of side effects associated with BEXTRA and the relative efficacy of BEXTRA compared with other readily available medications, Plaintiff would not have taken BEXTRA as she did.

124.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiff sustained a Heart attack; has required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; has suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages.  Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiff will continue to incur such losses in the future.

125.    Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

126.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
## (Unjust Enrichment)

127.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

128.    At all times relevant to this action, Defendants were the manufacturers, sellers, and/or suppliers of BEXTRA.

129.    Plaintiff paid for BEXTRA for the purpose of managing his pain safely and effectively.

130.    Defendants have accepted payment from Plaintiff for the purchase of BEXTRA.

131.    Plaintiff did not receive the safe and effective pharmaceutical product for which she paid.

132.    It is inequitable and unjust for Defendants to retain this money because the Plaintiff did not in fact receive the product Defendant represented BEXTRA to be.

133.    WHEREFORE, Plaintiff demands judgment against Defendants and seeks equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

1.    General damages in excess of the jurisdictional amount of this Court;

2.      Consequential damages;

3.      Disgorgement of profits;

4.      Restitution;

5.      Punitive and exemplary damages;

6.      Pre-judgment and post-judgment interest as provided by law;

7.      Recovery of Plaintiff's costs including, but not limited to, discretionary Court costs of these causes, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action; and

8.      Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

COMES NOW Plaintiff and demands a trial by jury on all issues presented herein.

Signed this _28_ day of February, 2008.

Ted G. Meadows (MN # 0335836)
Navan Ward, Jr. (AL# WAR062)
Andy D. Birchfield, Jr. (AL# BIR006)
Beasley, Allen, Crow,
Methvin, Portis, & Miles, P.C.
234 Commerce Street
Montgomery, Alabama 36104
Telephone:    334-269-2343
Facsimile:    334 – 954-7555
ATTORNEY FOR PLAINTIFF

⚙JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| THOMAS LAUER | PFIZER, INC., et al. |

| **(b)** County of Residence of First Listed Plaintiff  Montgomery, Ohio | County of Residence of First Listed Defendant  New York |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Navan Ward, Jr.,, Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.,
P.O. Box 4160, Montgomery, AL 36103-4160; (334) 269-2343

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☐ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☒ 4  Diversity
     (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☒ 365 Personal Injury – | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities – | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities – | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C.A. 1332

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE                              DOCKET NUMBER

DATE  2/28/08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

08-585 DWF/SRN

Inasmuch as no objection is
pending at this time, the
stay is lifted.

APR 11 2008

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAR 26 2008

FILED
CLERK'S OFFICE

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: BEXTRA AND CELEBREX MARKETING, SALES
PRACTICES AND PRODUCTS LIABILITY LITIGATION**

| | | |
|---|---|---|
| Thomas Lauer v. Pfizer Inc., et al., | ) | |
|     D. Minnesota, C.A. No. 0:08-585 | ) | MDL No. 1699 |
| Netra Thomas v. Pfizer Inc., et al., | ) | |
|     D. Minnesota, C.A. No. 0:08-586 | ) | |

## CONDITIONAL TRANSFER ORDER (CTO-99)

On September 6, 2005, the Panel transferred 30 civil actions to the United States District Court for the Northern District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 391 F.Supp.2d 1377 (J.P.M.L. 2005). Since that time, 1,206 additional actions have been transferred to the Northern District of California. With the consent of that court, all such actions have been assigned to the Honorable Charles R. Breyer.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Northern District of California and assigned to Judge Breyer.

Pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation</u>, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Northern District of California for the reasons stated in the order of September 6, 2005, and, with the consent of that court, assigned to the Honorable Charles R. Breyer.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Northern District of California. The transmittal of this order to said Clerk shall be stayed 15 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 15-day period, the stay will be continued until further order of the Panel.

A CERTIFIED TRUE COPY

APR 11 2008

ATTEST:
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

SCANNED
APR 18 2008
U.S. DISTRICT COURT MPLS

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

I hereby certify that the annexed
instrument is a true and correct copy
of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By
Deputy Clerk
Date 4-11-08

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Richard W. Wieking
Clerk

450 Golden Gate Avenue
San Francisco, CA 94102
415.522.2000

April 15th, 2008

Minnesota District Court
300 South Fourth Street
Minneapolis, MN 55415

Re: MDL 05-1699 In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation

Title of Case(s)
Thomas Lauer v. Pfizer Inc., et al.

Your Case Number(s)
C.A. No. 0:08-585

Dear Clerk:

Enclosed is a certified copy of the order from the Judicial panel on Multidistrict Litigation transferring the above entitled action to the Northern District of California, San Francisco Division. The case has been assigned to the Honorable Charles R. Breyer for coordinated or consolidated pretrial processing pursuant to 28 USC §1407.

Please forward the **original record** and **a certified copy of the docket entries** in the case listed above along with the enclosed copy of this transmittal letter to:

United States District Court
Northern District of California
450 Golden Gate Avenue, P.O. Box 36060
San Francisco, CA 94102
Attn: Simone Voltz

If the case is an electronic case filing please do one of the following: 1) e-mail the PDF documents, as separate PDF files, including a PDF copy of the docket sheet to **SFmdl_clerk@cand.uscourts.gov**, 2) provide us with a temporary log in and a password to directly access your database and to expedite the downloading of the PDF files we need and/or require, or, 3) if you prefer, on a disc. We appreciate your prompt attention to this matter.

Sincerely yours,
Richard W. Wieking, Clerk

By: Simone Voltz
Deputy Clerk

Encl.

**FILED**

JUN 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CLOSED, CV

## U.S. District Court
## District of Minnesota (DMN)
## CIVIL DOCKET FOR CASE #: 0:08-cv-00585-DWF-SRN

**CRB**

Lauer v. Pfizer, Inc. et alDO NOT DOCKET. CASE HAS
BEEN TRANSFERRED OUT.
Assigned to: Judge Donovan W. Frank
Referred to: Magistrate Judge Susan R. Nelson
Cause: 28:1332-pip-Diversity-Personal Injury, Product
Liability

Date Filed: 02/29/2008
Date Terminated: 04/23/2008
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**CRB**

**Plaintiff**    E-filing    **CV 08    2854**    **CRB**

**Thomas Lauer**

represented by **Andy D Birchfield, Jr**
Beasley Allen Crow Methvin Portis &
Miles
PO Box 4160
Montgomery, AL 36103-4160
334-269-2343
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Navan-NA Ward, Jr**
Not Admitted
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ted G Meadows**
Beasley Allen Crow Methvin Portis &
Miles, PC
PO Box 4160
Montgomery, AL 36103-4160
334-269-2343
Fax: 334-954-7555
Email: ted.meadows@beasleyallen.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Pfizer, Inc.**

**Defendant**

**Pharmacia Corporation**

**Defendant**

**G.D. Searle LLC**
*formerly known as*
G.D. Searle & Co.

**Defendant**

**Monsanto Company**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/29/2008 | 1 | COMPLAINT against all defendants ( Filing fee $ 350 receipt number 20313.) assigned to Judge Donovan W. Frank per Master List referred to Magistrate Judge Susan R. Nelson, filed by Thomas Lauer. (Attachments: # 1 Civil Cover Sheet) (dch) (Entered: 02/29/2008) |
| 02/29/2008 | | Summons Issued as to Pfizer, Inc., Pharmacia Corporation, G.D. Searle LLC, Monsanto Company. (dch) (Entered: 02/29/2008) |
| 04/18/2008 | 2 | CERTIFIED COPY OF THE CONDITIONAL TRASFER ORDER (CTO-99); transferring case to the Northern District of California for coordinated or consolidated pretrial proceedings. Case assigned to the Honorable Charles R. Bryer. (jdf) QC'd by JME. (Entered: 04/18/2008) |
| 04/18/2008 | | NOTICE that the case has been transferred/extracted to the Northern District of California. (jdf) (Entered: 04/18/2008) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/05/2008 15:49:29 | | | |
| **PACER Login:** | | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 0:08-cv-00585-DWF-SRN |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |